## BEECHER *vs.* THE DERBY BRIDGE AND FERRY COMPANY.

The plaintiff's horse, in passing over the defendants' toll-bridge, was injured, in consequence of the displacement of a plank in the floor; and upon the trial of an action upon the statute, entitled " An Act concerning Highways and Bridges," the plaintiff claimed, that the defendants were guilty of negligence, and liable for such injury. The defendants offered testimony, which was uncontradicted, to prove, not only that said bridge was substantially and properly erected, but that it was the duty of the defendants' gate-keeper, whenever any of its planks were unsafe, to put others in their places, and that he daily crossed said bridge four times, in such manner that he could see the entire floor, and had crossed it before said accident occurred, and on the same day; and the jury rendered a verdict in favor of the plaintiff. Held, that such verdict was against the weight of evidence, and that a new trial ought to be granted.

THIS was an action, brought upon the statute law of this state, entitled " An Act concerning Highways and Bridges." Rev. Stat., tit. 24, ch. 1, § 6.

The material part of the statute upon which this action is founded, is the sixth section, and is as follows:

" If any horse, or other beast, or cart, carriage, or other property, shall receive injury or damage by means of any defective bridge, the town, person, or persons, or corporation, which ought to keep such road or bridge in repair, shall pay to the owner of such beast or property, just damages."

The plaintiff, in his declaration, alleged substantially, that on the 10th day of October, 1852, he was passing upon, and across, a certain toll-bridge belonging to the defendants, and situated in the town of Derby, which ought to have been kept in repair by them, with his horse and wagon; that by means of said bridge being defective and out of repair, his horse's leg was thrust through between the planks in the floor of said bridge, and was greatly bruised and wounded; and that by reason of such injury to his horse, he wholly lost the use of the same, and had been obliged to expend large sums of money in endeavoring to cure him of said injuries, which said wrongs were contrary to the statute, &c.

The defendants pleaded the general issue, and the cause was tried by the jury, at the term of the superior court, holden in October, 1854.

On the trial, to prove the injury complained of, and that it was occasioned by said bridge being defective and out of repair, by the fault and negligence of the defendants, the plaintiff offered the deposition of James Tomlinson, who deposed, that on the 10th day of October, 1851, the plaintiff owned a gray mare, worth from three to five hundred dollars; that, while crossing said bridge, on a quick walk, the mare suddenly passed one of her hind legs between two planks, which were laid as a flooring to the bridge, up to, or above, the knee joint. There was a plank either turned on the edge, or otherwise removed from its place, so as to admit the foot and leg of any ordinary horse, or ox. That he had since seen the mare several times, and in the opinion of the witness, she was almost entirely ruined.

Edwin C. Johnson testified, that he went upon the bridge immediately after the accident, and, on the first reach of the

bridge, found a plank with one of its edges lying on another plank. That he tried to put it in its place, and could not succeed.

The plaintiff testified, that his horse would have sold for five hundred dollars, or more. That in passing said bridge, his horse walked, and after he had passed the middle of the bridge, one plank lay up on another. The horse stepped upon this plank, which turned over, and went through. That he did not see the hole in the bridge, until he was over it. The plank was very loose, but he could not tell how it became displaced. That he had expended, in the care and keeping of his horse, to the time of bringing the suit, fifty dollars, and that he was worth, at that time, not more than a hundred dollars.

The plaintiff introduced much other testimony, to prove the extent of the injury, and that it was occasioned as alleged in his declaration.

The defendants offered as a witness, Lewis Downs, who testified, that he lived in Birmingham, and occupied a farm on the opposite side of the river. That he crossed the bridge usually four or five times a day. The bridge was kept in as good repair as any he ever knew; that the planks were taken out, when half worn, and that oak planks, two and a half inches thick, were always on the bridge, to replace those worn. It was the business of those, who tended the gate, to take care of the bridge, and he saw them occasionally putting in planks. The defendants did everything that ought to be done, or would be required of any company. They used all the care that a prudent man would about his own affairs. For the last four years, he had been over there three or four times a day, and presumed that he crossed the bridge that day, but did not know, and had never noticed a plank up, as this was said to be. He never knew that they allowed such lapping to remain. Anything of that kind they attended to immediately. He thought this the strongest bridge, and kept in the best repair of any bridge he ever knew. It was built with all the usual precautions. He never knew a cov-

ered bridge, with oak planks, pinned or spiked.   He thought it would be better not to be pinned.   It would not weaken the string-piece.   The usual mode of building such bridges was not to pin, or spike down, the plank, as far as he knew, though not very conversant with such bridges.

On cross-examination, he testified that he noticed a plank with one edge upon another, two or three times in the course of twenty years.   The planks are not fastened, spiked or pegged, but laid down very tight.   He crossed the bridge seven or eight times a day, in October, 1851, and always saw the planks, when they were lapped, one over the other.

Elihu Moulthrop, testified as follows : " I was at the bridge tending gate, in the year 1851.   They required me to see that the planks were in good order on the bridge, and repair it, and if any plank was not safe to put in others that were. I crossed the bridge four times a day; averaged more than that, and always aimed to see that the bridge was in good order, on its travelled parts.   My attention was confined to this duty.   I could not go over it, if the plank was up, as said to be by the plaintiff, without seeing it.   When I saw a plank too wide, or too narrow, I always took it up before there was any danger.   The company always provided, and had on the bridge, good sound oak planks, ready ; the new were as much as two and a half inches thick.   I intended to keep the bridge safe for traveling.   I think no plank could have been out of place in the morning, without my seeing it before noon.   I went over early in the morning and back, and over and back at night.   If this plank, on the 10th of October, had been up in the morning, as described by plaintiff, I should have seen it.   If the plank had been up in the morning, as it was said to be, I should have seen it."

Cross-examination.   " I lived at West End Bridge.   I carried milk on foot ; two cans in my hands.   Returned generally in an hour.   Did the same at night.   Generally traveled on the center string-piece, so that I could see one side as well as the other.   Plank will sometimes fly up when

snow melts in spring, and require more care in keeping it then than at other times."

William B. Lewis, testified, " I reside about two miles west of the bridge, in Huntington, and passed it twice a day at that time. I considered the bridge always in good passable order and condition. I don't know of any thing more that could have been done, to ensure the safety of passengers. I always felt safe in passing. Have passed it twelve years. The flooring is divided into two tracks of eight or nine feet each, covered with oak plank two and a half inches thick, and five to eight or nine inches wide, lying by their own weight. It is a covered bridge. That mode of flooring a bridge is proper for such a bridge as that; it is floored in the same way as other bridges of this kind. My observation is not extensive. Have observed different modes of fastening, and have made up my mind, that it is the most prudent mode of placing the flooring, on account of convenience in replacing. Should object to pinning as troublesome, and causing great delays in repairing. This mode is simple and can be easily done. Public better accommodated than if pinned down. Pinning would eventually weaken the bridge. Plank are often put down green, and would shrink."

The defendants introduced much other testimony, tending to show the substantial character of the bridge, and their diligence in keeping it in repair.

The testimony being closed, the jury returned a verdict in favor of the plaintiff, for $225 damages, and the defendants moved for a new trial, on the ground that said verdict was manifestly against the weight of the evidence, and also on the ground of a misdirection by the court; but a detail of the ground of the latter motion is unnecessary, as no opinion is expressed upon it by the court.

*Baldwin, Wooster* and *Downs*, in support of the motion.

1. The plaintiff must show, not only that his horse was injured on the defendants' bridge, but also, first, that he exer-

cised reasonable care, while driving on the bridge, and that, by the exercise of reasonable care, he could not have avoided the accident; that no want of reasonable care and foresight on his part, contributed in any degree to the injury; and secondly, that there was negligence, or a want of reasonable and ordinary care, on the part of the defendants, either in the construction, or supervision and maintenance of this bridge: and thirdly, that such negligence, or want of ordinary care, was the cause of the injury. The statute contemplates a culpable " defect." Bridge owners are not insurers. *Butterfield* v. *Forrester*, 11 East., 60. *Williams* v. *Holland*, 25 E. C. L. R., 261. *Rathburn* v. *Payne*, 19 Wend., 401. *Hall* v. *Richmond*, 2 Wood. & Min., 345.

2. What constitutes negligence or want of ordinary care, is not a pure question of fact for the jury; it is so connected with principles of law, that it becomes a conclusion of law, rather than fact. A rule of responsibility, which courts, through their verdicts, aim to have faithfully and uniformly applied. *Derwort & ux.* v. *Loomer*, 21 Conn. R., 245.

3. There was no negligence, or want of ordinary care, on the part of the defendants, in the construction, or supervision and maintenance of this bridge. The testimony shows that the bridge was built of the most solid materials, and in all respects in the most substantial manner.

There was an attendant to superintend and watch it, who examined it four times at least each day, and often more than that. The tracks were examined, the morning that the accident is claimed to have happened, and there was no imperfection. All the planks were in their place, and no notice came to the defendants, from any source, that the bridge was imperfect. And there was no evidence that the plank, in question, had been in the position described, for five minutes previous to the accident.

There was negligence on the part of the plaintiff, who, passing the plank, which was raised as described by the

witnesses, at noon, when the bridge was well lighted, made no effort to stop his horse.

*Blackman* and *H. B. Munson*, against the motion.

1. The verdict of the jury was right; the main issue, on the trial, was as to the truth of this allegation in the declaration, viz., that the plaintiff's horse "was injured on said bridge, by means of the same being defective." The evidence clearly proves the truth of this allegation.

2. The plaintiff, having shown the fact of the injury, resulting from an actual defect in the bridge, was entitled to a verdict, without showing how this plank came to be too wide for its place, or how it came to be in that particular position, which occasioned the injury, or how long it had thus remained.

3. Although negligence is not the gist of the present action, the jury were warranted in presuming negligence, from the fact and nature of the defect.

The burden of proof was upon the defendants, who were bound to show, if the displaced plank had ever been fitted to the vacant aperture, or if it was ever so fitted, what unusual circumstance caused the change in its position, and if it was shifted out of its position by some extraordinary circumstance, why they had not ascertained and remedied the defect, before the injury occurred.

They have not shown that the care of the bridge was intrusted to a prudent and skilful agent, nor that the agent, to whom it was intrusted, examined it with any degree of care. If this plank was thrown out of place by the swelling of this, and other planks, occasioned by moisture, a careful examination, on the morning of the accident, would have detected and prevented it. If it was displaced by ordinary travel, it could not have been in a proper position, previous to its thus being displaced, which proper care would have remedied. If an unusual amount of travel had passed over

the bridge on the day of the accident, it ought to have been more frequently examined.

4. From the evidence before the jury, they were clearly authorized in finding the fact of negligence on the part of the defendants, or that they had not exercised all that care which a prudent man ought to exercise, under such circumstances.

HINMAN, J.   We think the verdict in this case so manifestly against the weight of evidence, that a new trial must be granted, on that ground.   The injury, complained of, appears to have been caused by reason of the displacement of one of the planks of the defendants' bridge, and, if there had been no evidence of diligence, on their part, to keep the bridge in repair, this might have justified a verdict against them, under the statute.   But the plaintiff's counsel admit, that to justify the verdict, the defect must have been one that reasonable care and diligence, on the defendants' part, would have guarded against, so as to prevent an injury, arising from it; and we think the defendants' testimony, which in this particular was uncontradicted, quite ample, not only as to the general good character of the bridge, but as to the great care that was taken to keep it in suitable repair.   In the language of one of the witnesses, it was a very strong and substantial bridge, with a double track, two outside walls, and a center string-piece; the planks eight and a half feet long, two and a half inches thick, from six to twelve inches wide, and supported by five sleepers within the eight and a half feet carriage-way; and the witness always considered the bridge to be strong, safe, and in good repair.   In connection with much evidence of this description, the defendants proved by their gate-keeper, that it was his duty to see that the planks were in good order, and if any were found unsafe, to put in others; that he crossed the bridge regularly four times a day, generally traveling on the center string-piece, so that he could see both tracks; and in this

way, he passed over the bridge, on the morning of the acci-
dent, and would have seen the plank had it then been up.
Now, considering that there was no conflicting testimony on
this point, and that we discover nothing which ought to dis-
credit this witness, we can come to no other conclusion than
that the jury, acting, probably, upon the mistaken notion
that the statute had, in effect, made the defendants insurers
of the safety of travelers over their bridge, must have disre-
garded this evidence, in finding their verdict.   No one would
claim, that it was the duty of the defendants to keep men
constantly upon their bridge, in order to see that all the
planks were in their proper places, at all times, and if any
thing short of this is reasonable diligence, it appears to us,
that a careful examination of it, four times a day, ought to
be deemed sufficient.   On this ground alone, we advise the
superior court to grant a new trial.   On the point of law,
raised by the motion, we therefore say nothing.

In this opinion, the other judges, WAITE and STORRS,
concurred.

New trial to be granted.